Docket No. 90151–Agenda 11–May 2001.

In re
 DETENTION OF HERBERT VARNER (The People of the State of Illinois, Appellee, v. Herbert Varner, Appellant).

Opinion filed October 18, 2001.

CHIEF JUSTICE HARRISON delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, Herbert Varner was found to be a sexually violent person under the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 
et seq.
 (West 1998)) and was committed to the custody of the Department of Human Services for control, custody and treatment. The appellate court affirmed, rejecting Varner’s claims that the Act is unconstitutional and that he should not have been committed to institutional care. 315 Ill. App. 3d 626. We granted Varner’s petition for leave to appeal. 177 Ill. 2d R. 315. The sole issue before us is whether the Act violates substantive due process because it is not limited to persons who lack volitional control over their behavior. For the reasons that follow, we affirm.

During the summer of 1988, Varner repeatedly fondled his five-year-old niece and had sexual intercourse with her. Based on that conduct, Varner was charged with criminal sexual assault (720 ILCS 5/12–13 (West 1998)). He pled guilty to the charge and was sentenced to a term of imprisonment of 13 years in the Illinois Department of Corrections.

As Varner’s prison term was ending and he was scheduled for entry into mandatory supervised release, the State initiated these proceedings to have him committed indefinitely to the Department of Human Services (Department) pursuant to the Sexually Violent Persons Commitment Act. Two days after the petition was filed, the trial court held a hearing to determine whether there was probable cause to believe that Varner was a sexually violent person within the meaning of the Act. Based on the evidence presented at that hearing, the trial court determined that probable cause existed and ordered Varner transferred to a Department facility for evaluation. See 725 ILCS 207/30 (West 1998).

The question of whether Varner was a sexually violent person was subsequently tried before a jury. The jury heard evidence that Varner may have been sexually abused as a child by his father. He had previously committed other sexual offenses involving children, including his daughter and another niece. At the time he committed the offense for which he was then incarcerated, he was only 28 years old.

Marc Levinson, a clinical psychologist employed by the Department of Corrections, diagnosed Varner as suffering from pedophilia and a personality disorder, the combination of which created a substantial probability that he will engage in further acts of sexual violence in the future. Although sexual offender treatment programs were available to Varner in prison, he failed to participate in them. According to Levinson, Varner claimed that he did not need sex offender treatment because he had not committed any sex offenses against children. When Varner was asked how he would prevent future occurrences of sex offenses, he told the psychologist that he would stay away from all women and all situations involving children.

Additional testimony was presented by Dr. Paul Heaton, a clinical psychologist employed by a group that contracts with the Department to perform evaluations for purposes of the Act. Heaton evaluated Varner on three occasions in 1998 and agreed with Levinson that he suffered from pedophilia. Heaton identified various recidivist risk factors that were present in Varner’s case and opined that there was a substantial probability that Varner would offend again due to his mental disorder.

A clinical psychologist named Eric Ostrov testified on Varner’s behalf. Ostrov opined that there is insufficient evidence to conclude that respondent is a pedophile. He stated, however, that he could not rule that diagnosis out. He further stated that he believed that Varner suffered from a personality disorder that could predispose him to commit more sexual violence. In Ostrov’s view, the risk that Varner would reoffend was moderate but could be reduced to minimal. Ostrov believed that Varner could benefit from sex offender treatment but that he must first admit what he had done, which would be very difficult for him. Ostrov proposed that Varner’s exposure to children be limited and controlled and that he be treated with Depo Provera, a chemical that lowers testosterone levels and thereby reduces an individual’s sex drive.

No further evidence was presented, and the matter was sent to jury for deliberation. The jury was instructed that it was to determine whether the State had proved beyond a reasonable doubt that Varner was a sexually violent person. The court’s definition of a sexually violent person tracked the language used in section 5(f) of the Act (725 ILCS 207/5(f) (West 1998)). Specifically, the jury was told that “[ a] sexually violent person means a person who has been convicted of a sexually violent offense and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.” The jury was further instructed that criminal sexual assault constitutes a “sexually violent offense,” and it was given the definition of “[m]ental disorder” set forth in section 5(b) of the Act, namely, “a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence” (725 ILCS 207/5(b) (West 1998)).

The jury returned a verdict in favor of the State, finding that Varner was a sexually dangerous person. The circuit court then entered an order committing Varner to the custody of the Department for institutional care and treatment in a secure facility. See 725 ILCS 207/40(a), (b)(2) (West 1998). Varner subsequently appealed, challenging the constitutionality of the Act on the grounds that it denies equal protection, violates the prohibitions against double jeopardy and 
ex post facto
 laws, deprives him of the right to waive a jury trial, and contravenes procedural and substantive due process guarantees. Varner’s appeal also raised a constitutional challenge to section 30(c) of the Act, as amended by Public Act 90–793, effective August 14, 1998, which prohibits a person from introducing testimony or evidence of his own expert if the person “refuses to speak to, communicate with, or otherwise fails to cooperate with the expert from the Department of Human Services who is conducting the evaluation” ordered by the court. 725 ILCS 207/30(c) (West 1998). In addition, Varner argued that the circuit court erred in ordering him committed to institutional care in a secure facility and that he was denied the effective assistance of counsel.

The appellate court rejected each of Varner’s claims. In the proceedings before our court, the only argument he continues to press is that the Act violates substantive due process. According to Varner, his commitment under the Act cannot be squared with the principles of substantive due process because it occurred without a specific finding by the jury that he lacked volitional control over his sexually violent criminal behavior.

Varner’s claim that commitment is constitutionally permissible only where the defendant lacks volitional control over his sexually violent conduct is based on the United States Supreme Court’s decision in 
Kansas v. Hendricks
, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997). In that case, the, the Supreme Court considered a Kansas civil commitment statue similar to the Illinois statute at issue here. In upholding the constitutionality of the Kansas statute against a substantive due process challenge, the Supreme Court noted that the mere diagnosis of a mental disorder is insufficient to justify forced hospitalization. Rather, the Court held that civil detainment is proper only in those narrow instances where an individual is unable to control his behavior and therefore poses a danger to the public health and safety. 
Hendricks
, 521 U.S. at 357, 138 L. Ed. 2d at 512, 117 S. Ct. at 2079. The Court explained:

“A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a ‘mental illness’ or ‘mental abnormality.’ [Citations.] These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control. The Kansas Act is plainly of a kind with these other civil commitment statutes: It requires a finding of future dangerousness, and then links that finding to the existence of a ‘mental abnormality’ or ‘personality disorder’ that makes it difficult, if not impossible, for the person to control his dangerous behavior. [Citation.] The precommitment requirement of a ‘mental abnormality’ or ‘personality disorder’ is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness.” 
Hendricks
, 521 U.S. at 358, 138 L. Ed. 2d at 512-13, 117 S. Ct. at 2080.

The Illinois law challenged by Varner is similar to the Kansas statute upheld by the United States Supreme Court in 
Hendricks
. 
In re Detention of Samuelson
, 189 Ill. 2d 548, 558 (2000). As with the Kansas statute, this state’s Sexually Violent Persons Commitment Act requires that the future danger posed by an individual be linked to the existence of a mental condition. The Illinois statute uses the term “mental disorder” rather than “mental abnormality” or “personality disorder,” but the particular nomenclature is not dispositive. What is significant is that, as with the Kansas law, the mental condition required in Illinois must be one which affects an individual’s ability to control his conduct. See 725 ILCS 207/5(b) (West 1998).

If the inclusion of such a requirement was sufficient to sustain the Kansas law against a substantive due process challenge, it is sufficient to save the Illinois law. As noted earlier in this disposition, the jury here received instructions that tracked the language of the Act. Under those instructions, the jury’s conclusion that Varner was a sexually violent person necessarily required a determination that he suffered from a mental disorder. For the reasons set forth in 
Hendricks
, the precommitment requirement of a mental disorder, as defined by the Act, was sufficient to “narrow[ ] the class of persons eligible for confinement to those who are unable to control their dangerousness.” 
Hendricks
, 521 U.S. at 358, 138 L. Ed. 2d at 513, 117 S. Ct. at 2080. Accordingly, there was no need for the jury to make any additional findings in this case regarding Varner’s ability to control his sexually violent conduct.

Our appellate court recently considered an identical claim in 
In re Detention of Trevino
, 317 Ill. App. 3d 324 (2000), and came to the same conclusion. We are unaware of any Illinois precedent that has reached a contrary result. Although there is support for Varner’s position in 
In re Care & Treatment of Crane
, 269 Kan. 578, 7 P.3d 285 (2000), 
cert. granted sub nom. Kansas v. Crane
, ___ U.S. ___, 149 L. Ed. 2d 372, 121 S. Ct. 1483 (2001), a decision by the Kansas Supreme Court, we find that case unpersuasive.

At issue in 
Crane
 was the same statute which the Kansas Supreme Court had struck down, but which the United States Supreme Court subsequently upheld in 
Hendricks
. In attempting to invalidate the law again, the Kansas Supreme Court looked first to the statutory language defining mental abnormality as a “condition affecting the emotional or volitional capacity which predisposes a person to commit sexually violent offenses,” a provision which parallels the Illinois definition of mental disorder as a “condition affecting the emotional or volitional capacity that predisposes a persons to engage in acts of sexual violence.” 725 ILCS 207/5(b) (West 1998).

The problem with the provision, in the Kansas Supreme Court’s view, is that it refers to emotional capacity as well as volitional capacity. The court reasoned that volitional capacity refers to the ability to exercise free choice or will and that a condition affecting the capacity to exercise free choice or will would, in this context, mean a condition that renders a person unable to control his or her behavior. By including emotional capacity, the court believed, the legislature must have intended to address some alternative circumstance in which the exercise of free will or choice is not at issue and the individual acts for reasons other than an inability to control his behavior. To the extent that such an individual might be subject to commitment under the statute, the court believed that the law was inconsistent with 
Hendricks
’ requirement that civil commitment statutes such as this be limited in their application to persons who cannot control their dangerous behavior.

Despite the parallels between the Kansas statute and the Illinois Act, we are unwilling to accept the Kansas court’s analysis. Unlike the Kansas Supreme Court, we do not believe that the legislature used the terms “emotional capacity” and “volitional capacity” as a way to differentiate between individuals who are capable of controlling their sexually violent behavior and those who are not. The inability to control sexually violent behavior is a 
sine qua non
 under the statute. The terms “emotional” and “volitional” are merely adjectives used to describe the reasons an individual might lack the capacity to control his behavior. Medical science’s understanding of mental pathology is imperfect and evolving, and the legislature used these terms simply to insure that everyone who is unable to control his or her sexually violent behavior is covered by the law, whatever the precise reason for that lack of control might be.

A second reason given by the Kansas Supreme Court for invalidating that state’s statute is that it applies, by its terms, not only to persons suffering from “mental abnormalities,” but also to persons suffering from “personality disorders.” There is no definition of “personality disorder” in the statute, and the court was concerned that where an individual suffers from a personality disorder rather than a mental abnormality, a jury could find him subject to civil commitment without first making a finding that he was unable to control his behavior. That problem does not exist under this state’s law. In defining “[s]exually violent person,” our statute does not refer to persons suffering from personality disorders, only to persons suffering from “mental disorders.” 725 ILCS 207/5(f) (West 1998). The term “mental disorder” is, in turn, specifically defined by the Illinois Act, and, as discussed earlier in this opinion, the precommitment requirement of a mental disorder, as defined by the Act, is sufficient to pass constitutional muster under 
Hendricks.

For the foregoing reasons, the judgment of the appellate court affirming the circuit court’s order committing Varner to the custody of the Department of Human Services for institutional care and treatment in a secure facility is affirmed.

Affirmed.